# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RAY BEYOND CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TRIMARAN FUND MANAGEMENT, L.L.C., | ) | |
| | ) | |
| | ) | C.A. No. 2018-0497-KSJM |
| Defendant and Counterclaim and Third-Party Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE HALIFAX GROUP, LLC, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  November 29, 2018
Date Decided:  January 29, 2019

Kenneth J. Nachbar and Sabrina M. Hendershot of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, and Phillip A. Geraci, Aaron F. Miner, and Harry K. Fidler of Arnold & Porter Kaye Scholer LLP, New York, New York, *Attorneys for Plaintiff/Counterclaim Defendant Ray Beyond Corp. and Third-Party Defendant The Halifax Group, LLC*

Robert S. Saunders, Jenness E. Parker, Lauren N. Rosenello, and Jessica M. Jones of SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, Wilmington, Delaware, *Attorneys for Defendant and Counterclaim and Third-Party Plaintiff Trimaran Fund Management, L.L.C.*

McCORMICK, V.C.

This decision on the plaintiff's motion for judgment on the pleadings addresses the scope of authority conferred under a contractual dispute resolution provision upon an independent accountant designated "an expert, not an arbitrator."

The dispute resolution provision at issue is found in an Agreement and Plan of Merger (the "Merger Agreement") executed on April 13, 2018. Pursuant to the Merger Agreement, Plaintiff Ray Beyond Corp. ("Ray Beyond") acquired ChanceLight, Inc. ("ChanceLight") from its selling security holders, including Defendant Trimaran Fund Management, L.L.C. ("Trimaran"). Ray Beyond paid a base price of $125 million, $23.1 million of which was placed in escrow at closing. Release of the escrowed funds depends on a ChanceLight subsidiary, Ombudsman Educational Services, Ltd. ("Ombudsman"), entering post-closing into a qualifying contract with the Chicago Public Schools ("CPS"). The section of the Merger Agreement governing the release of the escrowed funds delegates certain matters to an independent accountant for resolution. The parties dispute whether a qualifying contract was ever executed. They further dispute whether their disagreement concerning a qualifying contract must be referred to the independent accountant.

This decision denies Ray Beyond's motion for judgment on the pleadings seeking to specifically enforce the dispute resolution provision. The Merger Agreement designates the independent accountant "an expert, not an arbitrator."[1]

---

[1] Merger Agr. § 6.17(e).

Under settled Delaware case law, such language calls for an expert determination, not an arbitration.[2]  Expert determination provisions are fundamentally different from arbitration provisions.  The former limit the scope of the third-party decision maker's authority to factual disputes within the decision maker's expertise.  The latter typically confers upon the third-party decision maker broad authority similar to that of judicial officers.  By invoking language calling for an expert determination, the Merger Agreement narrows the third-party decision maker's scope of authority to factual disputes within an independent accountant's expertise.

The parties' escrow dispute does not fit within the independent accountant's narrow authority.  To determine who is entitled to the escrow funds, one must determine whether CPS and Ombudsman entered into a qualifying contract.  This issue raises the primarily legal question of whether a certain contract meets the definition of a qualifying contract.  That question is not within the scope of the independent accountant's expertise.  Accordingly, Ray Beyond is not contractually entitled to require Trimaran to submit this dispute to the independent accountant, and the motion for judgment on the pleadings as to Ray Beyond's claim for specific performance must be denied.

---

[2] *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912 (Del. 2017); *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 2018 WL 3343495 (Del. Ch. July 9, 2018), *judgment entered*, 2018 WL 3845737 (Del. Ch. Aug. 10, 2018); *AQSR India Private, Ltd. v. Bureau Veritas Hldgs., Inc.*, 2009 WL 1707910 (Del. Ch. June 16, 2009).

This decision also denies Ray Beyond's motion for judgment on the pleadings on Trimaran's counterclaims. Ray Beyond predicates these arguments on its entitlement to specific performance of the expert determination provision, and the arguments thus fail for the same reasons.

Ray Beyond's parent affiliate, The Halifax Group, Inc. ("Halifax"), has moved for judgment on the pleadings on Trimaran's third-party claim for tortious interference. A contracting party's parent entity may be held liable for tortious interference in limited circumstances. To state such a claim, a plaintiff must allege facts that, if true, demonstrate that the parent sought maliciously or in bad faith to injure the plaintiff. The few facts Trimaran alleges specific to Halifax fall far short of this standard. This decision therefore grants Halifax's motion for judgment on the pleadings on Trimaran's third-party complaint.

The reasoning for these conclusions follows.

## I. BACKGROUND

The facts are drawn from the operative pleadings and the documents they incorporate by reference.[3] All reasonable inferences are drawn in a light most favorable to Trimaran, the non-moving party.[4]

---

[3] *Penton*, 2018 WL 3343495, at *1.

[4] *See Chi. Bridge*, 166 A.3d at 917 n.13 (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1999, 1205 (Del. 1993)).

## A.  Merger Agreement

On April 13, 2018, Ray Beyond, an affiliate of The Halifax Group, LLC ("Halifax"), entered into the Merger Agreement to acquire ChanceLight.[5] ChanceLight is a Delaware corporation that provides behavioral health, therapy, and educational solutions for children and young adults.[6]  Pursuant to the Merger Agreement, Ray Beyond acquired all of the equity interests in ChanceLight from its selling securityholders, including Trimaran.[7]  Trimaran was designated the Securityholders Representative.[8]  The parties structured the acquisition as a merger between Ray Beyond's wholly-owned subsidiary, Ray Beyond Acquisition Corp., and ChanceLight.[9]  The merger closed on April 27, 2018.[10]  The Merger Agreement set a base purchase price of $125 million, subject to post-closing adjustments.[11]

---

[5] *See* C.A. No. 2018-0497-KSJM Docket No. ("Dkt.") 11, Def. Trimaran Fund Management, L.L.C.'s Answer, Affirmative Defenses ("Trimaran Ans."), Verified Counterclaims and Third-Party Complaint ("Trimaran Compl."), Trimaran Compl. ¶ 2.

[6] Dkt. 1, Ray Beyond's Verified Complaint for Specific Performance ("Ray Beyond Compl.") ¶ 13.

[7] *Id.*

[8] Ex. A to Dkt. 21, Opening Brief in Support of Pl./Counterclaims Def. Ray Beyond Corp.'s and Third-Party Def. The Halifax Group, LLC's Motion for Judgment on the Pleadings ("Pl.'s Op. Br."), Merger Agreement (cited as "Merger Agr."), Preamble.

[9] Trimaran Compl. ¶ 2.

[10] *Id.* ¶ 20.

[11] *Id.* ¶ 2.

### 1. CPS Contract

Ombudsman provides alternative learning opportunity programs to CPS students.[12] Prior to the merger, Ombudsman's contract with CPS (the "CPS Contract") was a key source of earnings for ChanceLight and was set to expire on June 30, 2018.[13] In February 2018, ChanceLight responded to the CPS Board's request for proposals for a new contract.[14]

### 2. CPS Escrow Amount

At the time the merger closed, the CPS Board was considering ChanceLight's RFP response.[15] The parties could not know whether CPS would continue contracting with Ombudsman for services.[16] To compensate the sellers for any continued business post-closing between Ombudsman and CPS that met certain value thresholds, the Merger Agreement established an escrow account into which $23.1 million of the $125 merger consideration was deposited (the "CPS Escrow Amount").[17]

---

[12] *Id.* ¶ 28.

[13] *Id.* ¶ 3.

[14] *Id.* ¶ 28.

[15] *Id.* ¶ 21.

[16] *Id.*

[17] *Id.* ¶ 3.

### 3. New CPS Contract

The parties' respective entitlement to all or a portion of the CPS Escrow Amount depended on whether Ombudsman received, before a date certain, a "New CPS Contract."[18]

Section 1.1 of the Merger Agreement defines what constitutes a "New CPS Contract" as:

> [A] contract Ombudsman seeks to enter into with the B of Ed. [of Chicago Public Schools] in connection with the proposal submitted by the Ombudsman on February 8, 2018 to the B of Ed. (the "CPS RFP").[19]

"CPS Contract," in turn, is defined as:

> [T]he Alternative Learning Opportunities Program Agreement, dated July 1, 2013, by and between Ombudsman . . . and the B of Ed.[20]

And relevant to these definitions, Section 1.1 of the Merger Agreement defines "Contract" as:

> [A]ny binding agreement, license, contract, lease, deed, note instrument or indemnity agreement including any amendment, extension, renewal, guarantee or other supplement with respect thereto.[21]

---

[18] Merger Agr. § 6.17. Entitlement could also be triggered by the CPS Board expressing an "Intent to Award" a New CPS Contract before a date certain, but that concept is not implicated by the parties' dispute and therefore not discussed in this decision. *Id.*

[19] *Id.* § 1.1.

[20] *Id.*

[21] *Id.*

6

### 4. Entitlement to CPS Escrow Amount

Section 6.17 of the Merger Agreement governs the parties' entitlement to the CPS Escrow Amount.[22]

Under Section 6.17, if Ombudsman received no New CPS Contract, then Ray Beyond would be entitled to the CPS Escrow Amount in its entirety,[23] and if Ombudsman received a New CPS Contract, then Trimaran would be entitled to some or all of the CPS Escrow Amount.[24]

If Ombudsman received a New CPS Contract meeting one or more of five agreed-upon "CPS Tests" in Section 6.17(b), Trimaran was entitled to the full escrow amount.[25] The first four CPS Tests evaluated the value of the new contract based on objective criteria (the contract's substantial similarity to the prior CPS Contract or the RFP response,[26] or capacity of students served and the payment modifier based on percentage of attendance[27]). The fifth CPS Test adopted a more flexible concept, calling for an evaluation of, and the parties' agreement on, the "financial impact" of the New CPS Contract on ChanceLight.[28]

---

[22] Trimaran Compl. ¶ 4.

[23] Merger Agr. § 6.17(c)(iii).

[24] *Id.* § 6.17(a)-(b), (d).

[25] *Id.* § 6.17(b).

[26] *Id.* § 6.17(b)(i)-(ii).

[27] *Id.* § 6.17(b)(iii)-(iv).

[28] *Id.* § 6.17(b)(v).

If the New CPS Contract did not meet the CPS Tests, but exceeded a ceiling of economic value defined by objective criteria set forth in Section 6.17(c)(i), Section 6.17(d) provided a "middle ground" scenario, whereby the parties would discuss in good faith whether and how to split the CPS Escrow Amount.[29]

### 5. Settlement Accountant Provisions

Section 6.17 provides that certain disputes regarding the distribution of the CPS Escrow Amount would be resolved by a third-party independent accounting firm called the "Settlement Accountant,"[30] which would be "an expert, not an arbitrator."[31]

Section 6.17 specifically invokes the Settlement Accountant procedure in three places. The first appears in the flexible fifth CPS Test (Section 6.17(b)(v)) and the second appears in the "middle ground" scenario (Section 6.17(d)). In either situation, if the parties negotiating in good faith were unable to reach an agreement concerning an appropriate distribution of the CPS Escrow Amount, within ten days of receipt of the New CPS Contract, the parties stipulated that "the matter shall be

---

[29] *Id.* § 6.17(d).

[30] *Id.* § 2.12 (defining "Settlement Accountant" as PricewaterhouseCoopers LLP or "such other independent accounting firm agreed to by [the parties]"); *id.* §§ 6.17(b)(v), (d), (g) (invoking Settlement Accountant procedure).

[31] *Id.* § 6.17(e).

referred to the Settlement Accountant and the determination of the Settlement Accountant shall be binding . . . ."[32]

The third invocation of the Settlement Accountant in Section 6.17 is found in Section 6.17(g), which states that "[i]n the event that the CPS Escrow Amount is not fully distributed prior to July 1, 2018 . . . and [Ray Beyond] and [Trimaran] are not able in good faith to agree upon an appropriate distribution of the CPS Escrow Amount, the matter shall be referred to the Settlement Accountant . . . ."[33]

In addition to Section 6.17, the Merger Agreement invokes the Settlement Accountant procedure in one other section—Section 2.12, which sets forth the procedure for preparing a post-closing price adjustment of initial merger consideration based on the closing date balance sheet. [34]

## B.    Events Leading to Litigation

On May 7, 2018, the CPS Board of Education notified Ombudsman that it would not be making an award to Ombudsman.[35]  Ray Beyond describes this letter as an unambiguous notice that the CPS Board of Education determined not to award a New CPS Contract.[36]

---

[32] *Id.* §§ 6.17(b)(v), (d).

[33] *Id.* § 6.17(g).

[34] *Id.* § 2.12(b).

[35] Ray Beyond Compl. ¶ 3.

[36] Pl.'s Op. Br. at 6-7.

Two days later, the CPS Board of Education informed Ombudsman that CPS would be extending the CPS Contract by one year (the "Extension").[37] The Extension was later memorialized in writing and publicly disclosed on June 27, 2018.[38] Trimaran did not become aware of the Extension until it was publicly disclosed.[39] Trimaran argues that the Extension qualifies as a New CPS Contract.[40]

The parties exchanged letters from May 14, 2018 to July 1, 2018, disputing whether the Extension qualifies as a New CPS Contract.[41] As of July 1, 2018, Ray Beyond believed itself entitled to the full escrow amount and that Section 6.17 required that the dispute be submitted to the Settlement Accountant for resolution.[42] Trimaran believed itself entitled to the full escrow amount and that the dispute over a New CPS contract was not within the scope of the Settlement Accountant's authority.[43]

---

[37] Trimaran Compl. ¶ 30.

[38] *Id.* ¶ 31 & Ex. 1.

[39] Trimaran Compl. ¶ 31.

[40] Trimaran Ans. ¶ 26; Trimaran Compl. ¶ 32; Dkt. 42, Trimaran Fund Management, L.L.C.'s Answering Brief in Opposition to Plaintiff and Counterclaim Defendant Ray Beyond Corp. and Third-Party Defendant The Halifax Group, LLC's Motion for Judgment on the Pleadings ("Def.'s Ans. Br.") at 3, 13, and 19-20.

[41] Ray Beyond Compl. ¶¶ 4, 25-29; Trimaran Ans. ¶¶ 4, 25-29.

[42] Ray Beyond Compl. ¶¶ 25, 29; Trimaran Ans. ¶¶ 25, 29.

[43] Ray Beyond Compl. ¶¶ 26, 28; Trimaran Ans. ¶¶ 26, 28.

## C. Procedural Posture

On July 9, 2018, Ray Beyond filed this action seeking specific performance of Section 6.17(g) of the Merger Agreement,[44] which Ray Beyond describes as the "exclusive mechanism through which the Parties are required to settle the distribution of the CPS Escrow Amount."[45] On August 1, 2018, Trimaran answered the Complaint asserting four counterclaims against Ray Beyond.[46] Counterclaim I seeks a declaration that the Extension is a New CPS Contract.[47] Counterclaim II claims that Ray Beyond breached the Merger Agreement by refusing to release the CPS Escrow Amount to Trimaran and by failing to inform Trimaran of its communications with the CPS Board of Education.[48] Counterclaim III claims that Ray Beyond breached the implied covenant of good faith and fair dealing by refusing to release the CPS Escrow Amount.[49] Counterclaim IV claims that Ray Beyond has been unjustly enriched by the benefits of the Extension.[50] Trimaran also asserted a fifth claim against third-party defendant Halifax, claiming that Halifax tortiously

---

[44] Dkt. 1.

[45] Ray Beyond Compl. ¶¶ 5, 18.

[46] Dkt. 11.

[47] Trimaran Compl. ¶¶ 36-38.

[48] *Id.* ¶¶ 39-44.

[49] *Id.* ¶¶ 45-52.

[50] *Id.* ¶¶ 53-57.

11

interfered with Trimaran's contractual rights by refusing to execute a joint instruction to release the escrowed funds.[51]

Ray Beyond filed its Reply, Answer, and Affirmative Defenses on August 15, 2018,[52] and moved for judgment on the pleadings on September 4, 2018.[53] The motion seeks a judgment on (i) Ray Beyond's claim for specific performance, (ii) all of Trimaran's counterclaims against Ray Beyond, and (iii) Trimaran's third-party claim against Halifax.

## II. ANALYSIS

A party is entitled to judgment on the pleadings only where "no material issue of fact exists and the movant is entitled to judgment as a matter of law."[54] The Court must "'view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party.'"[55]

Viewing the facts in the light most favorable to Trimaran, this decision denies Ray Beyond's motion as to the claims for specific performance and Trimaran's four counterclaims, and grants Halifax's motion on Trimaran's third-party claim for tortious interference.

---

[51] *Id.* ¶¶ 58-62.

[52] Dkt. 18.

[53] Dkt. 21.

[54] *Chi. Bridge*, 166 A.3d at 925.

[55] *Id.* at 917 n.13 (quoting *Desert Equities*, 624 A.2d at 1199).

## A. Specific Performance

Ray Beyond seeks specific performance of Section 6.17(g) of the Merger Agreement, which it contends delegates resolution of all disputes concerning the CPS Escrow Amount to the Settlement Accountant. Ray Beyond argues that Section 6.17(g) requires Trimaran to submit the legal question concerning what constitutes a New CPS Contract, as well as all other disputes affecting distribution of the CPS Escrow Amount, to the Settlement Accountant.

The specific sentence of Section 6.17(g) that Ray Beyond seeks to enforce provides: "in the event that the CPS Escrow Amount is not fully distributed prior to July 1, 2018 . . . and [Ray Beyond] and [Trimaran] are not able in good faith to agree upon an appropriate distribution of the CPS Escrow Amount, the matter shall be referred to the Settlement Accountant."[56] Applying basic rules of grammar to the preceding quote, the pronominal "the matter" refers to "appropriate distribution of the CPS Escrow Amount." Thus, according to Ray Beyond, the language of Section 6.17(g) requires that all issues affecting the "appropriate distribution of the CPS Escrow Amount" be referred to the Settlement Accountant.[57]

Nothing on the face of Section 6.17(g) expressly indicates whether the Settlement Accountant's authority to determine "appropriate distribution" should be

---

[56] Merger Agr. § 6.17(g).

[57] Pl.'s Op. Br. at 2-3.

broadly construed to include the authority to resolve all questions, including legal questions, affecting distributions. To argue that it should be interpreted as such, Ray Beyond points to the litigation bar of Section 6.17(e), which provides that the parties "shall not, institute any action of any kind . . . with respect to the matters that are the subject of . . . Section 6.17."[58] This litigation bar, Ray Beyond argues, forecloses the parties from submitting legal disputes concerning Section 6.17 to a court of law.[59] If Section 6.17(e) forbids the parties from instituting litigation concerning the subject matter of Section 6.17, Ray Beyond reasons that the Settlement Accountant's authority under Section 6.17(g) must delegate to the Settlement Accountant the authority to resolve issues traditionally relegated to a court of law.[60]

In addressing Ray Beyond's contractual interpretation, "[t]he critical issue for the Court to decide . . . is what the shared intentions of the contracting parties were when they entered the Agreement."[61] In determining the intention of the parties entering into an agreement, "courts must read the specific provisions of the contract in light of the entire contract."[62] This principle of construction, known as the

---

[58] Merger Agr. § 6.17(e).

[59] Pl.'s Op. Br. at 9.

[60] *Id.* at 17.

[61] *Alliant Techsys., Inc. v. MidOcean Bushnell Hldgs.*, 2015 WL 1897659, at *1 (Del. Ch. Apr. 27, 2015).

[62] *Chi. Bridge*, 166 A.3d at 913-14. *See also E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such

14

"whole-text canon," stems from the theory that "[c]ontext is a primary determinant of meaning."[63] The Delaware Supreme Court views a contextual analysis as critical where, as here, "the contract at issue involves a definitive acquisition agreement addressing the sale of an entire business."[64] As part of a whole-text analysis, the court must avoid interpreting a legal text in a manner that renders provisions superfluous[65] or creates discord or tension between the parts of the text.[66]

Viewed in the context of the entire contract, Ray Beyond's interpretation of Section 6.17(g) does not support its claim for specific performance.

---

inference runs counter to the agreement's overall scheme or plan[.]"); *id.* at 1114 (it is a "cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions"); *Charney v. Am. Apparel, Inc.*, 2015 WL 5313769, at *10 (Del. Ch. Sept. 11, 2015) ("Delaware courts . . . construe agreements as a whole and give meaning to all provisions."), *judgment entered*, 2015 WL 5703109 (Del. Ch. Sep. 25, 2015).

[63] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24 167-69 (2012).

[64] *Chi. Bridge*, 166 A.3d at 913-14.

[65] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will not read a contract to render a provision or term 'meaningless or illusory.'" (quoting *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992) ("Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless."))); *EMSI Acq., Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *16 (Del. Ch. May 3, 2017) ("[T]erms within a contract must be afforded their plain meaning and any such plain terms should not be read to render other provisions meaningless[.]").

[66] *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *6 (Del. Ch. June 21, 2012) ("Delaware law requires that this court attempt to give effect to the plain terms of all provisions of a contract, and to give them a harmonious reading" (citing *E.I. du Pont de Nemours*, 498 A.2d at 1114)).

Broadly interpreting "the matter" of the "appropriate distribution" to include legal questions is inconsistent with the parties' intent to narrow the Settlement Accountant's role to that of "an expert, not an arbitrator."[67] Delaware courts have interpreted similar expert-not-arbitrator stipulations as calling for an expert determination, not an arbitration.[68] Expert determination and arbitration provisions confer fundamentally different scopes of authority to third-party decision makers.[69] A typical expert determination provision limits the decision maker's authority to

---

[67] Merger Agr. § 6.17(e).

[68] *See Chi. Bridge*, 166 A.3d at 931 ("For one thing, the Purchase Agreement states in multiple places that the auditor was acting 'as an expert and not as an arbitrator.' That language by itself has been read to narrow the scope of the expert's domain." (citing *AQSR* and New York law)); *Penton*, 2018 WL 3343495, at *13 ("Under English law, the 'expert not arbitrator' language is the standard phrase that parties use to invoke an expert determination. As one authoritative treatise explains, '[t]he most commonly encountered wording is that the expert is "to act as an expert and not as an arbitrator."' The authors remark that '[t]he use of the expression "as an expert and not as arbitrator" is now so common that it is difficult to conceive of a case in which a court would not treat those words as meaning exactly what they say.'" (quoting Clive Freedman & James Farrell, *Kendall on Expert Determination* 160 (5th ed. 2015))); *AQSR*, 2009 WL 1707910, at *7 (interpreting an agreement provision that stated "the Referee shall be functioning as an expert and not as an arbitrator" as requiring an expert determination). *Cf. Agiliance, Inc. v. Resolver SOAR, LLC*, C.A. No. 2018-0389-TMR, at 10 (Del. Ch. Jan. 25, 2019) (finding that a dispute resolution provision required arbitration where the agreement was replete with references to arbitration and did not include an expert-not-abitrator provision or the word "expert").

[69] *See generally* N.Y.C. Bar Comm. on Int'l Commercial Arbitration, *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements* at p.4 & §§ II, IV.C (2013) [hereinafter *N.Y.C. Bar Report*] (cited in *Chi. Bridge*, 166 A.3d at 931 n.81, and discussed in *Penton*, 2018 WL 3343495, at *13-16); *see also AQSR*, 2009 WL 1707910, at *7-8.

deciding a specific factual dispute within the decision maker's expertise.[70]   In

contrast, the scope of authority conferred on an arbitrator is analogous to the

authority conferred on a judicial officer.[71]   The Merger Agreement's expert-not-

arbitrator provision, therefore, signals the parties' intent to limit the scope of the

Settlement Accountant's authority to discrete factual issues within an independent

accountant's expertise.

Delaware cases on this issue are all in accord.   In *Chicago Bridge*,[72] the

Delaware Supreme Court considered a third-party dispute resolution provision

concerning a post-closing purchase price adjustment.[73]   The Court concluded that a

---

[70] *N.Y.C. Bar Report*, at 4 ("The fundamental difference between an expert determination and arbitration can be found in the type and scope of authority that is being delegated by the parties to the decision maker.  In the case of a typical expert determination, the authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation. The decision maker's authority is limited to its mandate to use its specialized knowledge to resolve a specified issue of fact.  The parties agree that the expert's determination of the disputed factual issue will be final and finding on them.  The parties are not, however, normally granting the expert the authority to make binding decisions on issues of law or legal claims, such as legal liability.").

[71] *Id.* ("If the proceeding is an arbitration, this means that the parties have intended to delegate to the decision maker authority to decide all legal and factual issues necessary to resolve the matter.  The grant of authority to an arbitrator, but not to an expert, is analogous to the powers of a judge in a judicial proceeding.  The parties expect the arbitrator to rule on legal claims, legal causes of action and to award a legal remedy, such as damages or injunctive relief.  The parties by agreeing to arbitration, are selecting a form of dispute resolution that by its very definition is understood as granting the decision maker the authority to make binding decisions of both law and fact.").

[72] 166 A.3d at 931.

[73] *Id.* at 915.

17

third-party expert-not-arbitrator lacked the authority to consider legal issues—breaches of representations and warranties regarding the target's historical accounting practice—when calculating the price adjustment.[74] Chief Justice Strine, writing for the panel, observed that as a result of the expert-not-arbitrator provision, the third-party decision maker did not have wide-ranging authority to adjudicate all disputes that arose under the merger agreement, but rather, authority "confined to a discrete set of narrow disputes."[75]

The Court of Chancery reached similar conclusions in *Penton*[76] and *AQSR*.[77]

*Penton* involved an agreement and plan of merger under which the buyer acquired a corporate subsidiary from its LLC parent.[78] The merger agreement provided for a referee procedure provision, pursuant to which an independent auditor would allocate post-merger transaction-related tax benefits.[79] The agreement described the referee as an expert-not-arbitrator, which Vice Chancellor Laster held limited the referee's authority to narrow questions and foreclosed analogies to arbitration doctrines.[80] The Vice Chancellor explained that when parties call for an

---

[74] *Id.* at 931-32.

[75] *Id.* at 931.

[76] 2018 WL 3343495, at *16.

[77] 2009 WL 1707910, at *7.

[78] 2018 WL 3343495, at *1.

[79] *Id.*

[80] *Id.*

expert determination, they are generally not "'grant[ing] the expert the authority to make binding decisions on general issues of law or legal disputes,'" and an "'expert is neither expected nor authorized to make final and binding rulings on issues of law.'"[81]

*AQSR* involved an asset purchase agreement, under which the buyer was to purchase all contracts that met certain specified criteria.[82] The purchase agreement included a referee provision appointing an industrial board representative to determine which customer contracts fell within the scope of the agreement.[83] The agreement described the referee as an expert-not-arbitrator,[84] which then-Vice Chancellor Strine held limited the representative's "scope of authority . . . to specific, technical questions."[85] The Court described the referee procedure as "a narrow dispute resolution mechanism" that was "designed to take advantage of the technical expertise, rather than the arbitration skills, of the Referee, and is only triggered when the parties teed up a narrow, technical question in the course of the Review Process."[86]

---

[81] *Id.* at *17 (emphasis added and citation omitted).

[82] 2009 WL 1707910, at *1.

[83] *Id.* at *7 & n.19.

[84] *Id.* at *7 (citation omitted).

[85] *Id.* at *2.

[86] *Id.*

Although, as the Court observed in *Penton*, it is "possible to envision a setting where the parties included 'expert not arbitrator' language, but then constructed a dispute resolution provision that had numerous features associated with commercial arbitration,"[87] the parties to the Merger Agreement did not do so, as revealed by the following:

Arbitration provisions typically include procedural rules affording each party the opportunity to present its case;[88] indeed, this is viewed as a "defining characteristic" of arbitration provisions.[89] By contrast, the Settlement Accountant provisions contain no reference to procedural rules.

Arbitration provisions typically broadly encompass the entire legal and factual dispute between the parties.[90] By contrast, the Merger Agreement invokes the

---

[87] 2018 WL 3343495, at *13.

[88] *See, e.g.*, *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80 (Del. 2006) (interpreting an arbitration provision that invoked the rules of the American Arbitration Association); *Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH*, 2011 WL 1348438, at *16 (Del. Ch. Apr. 8, 2011) (same). *See also* Roger S. Haydock and David F. Herr, *Discovery Practice* § 37.04 (8th ed. 2019) ("[P]arties typically identify procedural rules in their arbitration clause . . . .").

[89] *See* Gary B. Born, *International Arbitration: Law and Practice* § 1.01[A][4] (2nd ed. 2016) [hereinafter "Born, *International Arbitration*"] ("[A] defining characteristic of 'arbitration' is the use of impartial adjudicative procedures which afford each party the opportunity to present its case. Forms of dispute resolution that do not provide parties the opportunity to present their views (such as in valuation, where the decision maker proceeds with an independent investigation) do not generally constitute arbitration.").

[90] *Id.* (citing cases); *see also N.Y.C. Bar Report*, at 4 ("If the proceeding is an arbitration, this means that the parties have intended to delegate to the decision maker authority to decide all legal and factual issues necessary to resolve the matter. The grant of authority to an arbitrator, but not to an expert, is analogous to the powers of a judge in a judicial

Settlement Accountant procedure in limited instances.[91] Of these instances, the three

not at issue in this litigation require financial conclusions within an accountant's

field of expertise.[92] The parties' inclusion of a tight 20-day deadline reinforces the

conclusion that the parties did not intend to vest the Settlement Accountant with

authority over wide-ranging matters.[93]

---

proceeding . . . The parties, by agreeing to arbitration, are selecting a form of dispute resolution that by its very definition is understood as granting the decision maker the authority to make binding decisions of both law and fact."); Born, *International Arbitration* § 1.01[C][2] ("[E]xpert determinations frequently involve narrowly-defined and circumscribed factual or technical issues, *unlike arbitral proceedings, which seek to resolve broader legal disputes between the parties . . . .*" (emphasis added)).

[91] Merger Agr. § 2.12(b), 6.17(b)(v), 6.17(d), 6.17(g).

[92] *Id*. § 2.12(b) (purchase-price adjustment), 6.17(b)(v) (fifth CPS test evaluating the "financial impact" of the New CPS Agreement), 6.17(d) (the "middle ground" scenario).

[93] *Compare* Merger Agr. § 6.17(e) ("the Settlement Accountant shall make such a determination within twenty (20) days following the written submission of the matter to the Settlement Accountant") *with Chi. Bridge*, 166 A.3d at 915 (finding that a true-up provision requiring an independent accountant to issue its determination in an "expedited time frame of 30 days" did not broadly delegate wide-ranging dispute resolution authority to the accountant).

Arbitration of legal issues arising in post-closing price disputes is typically conducted by legal professionals.[94] By contrast, the Settlement Accountant is an independent accountant.[95]

Taken together, and coupled with the expert-not-arbitrator stipulation, these factors reveal that the Settlement Accountant provisions call for an expert determination as opposed to an arbitration.

Ray Beyond's attempt to distinguish the overwhelming weight of Delaware authority interpreting expert-not-arbitrator provisions by pointing to the litigation bar of Section 6.17(e) does not work. Reading Section 6.17(e)'s litigation bar to foreclose litigation on *all* matters under Section 6.17, as Ray Beyond urges, renders aspects of Section 6.17 meaningless. For example, Section 6.17(h) confers rights on the sellers enforceable *prior to* closing: "[p]rior to the Closing, neither [Ray Beyond nor its affiliates] shall communicate orally or in writing with the B of Ed., without the prior written consent of [Trimaran]."[96] The right to invoke the Settlement

---

[94] *See* A. Vincent Biemans and Gerald M. Hansen, *M&A Disputes: A Professional Guide to Accounting Arbitrations* 9 (2017) ("The non-accounting aspects of [post-closing price adjustment] disputes are typically brought before attorney arbitrators or judges . . . ."). There are certainly exceptions to this rule. In *Agiliance*, for example, the Court concluded that a distinguishable dispute resolution provision calling for an independent accountant, as opposed to a law-trained professional, required arbitration. C.A. No. 2018-0389-TMR, at 11-12. Accordingly, the fact that the parties to the Merger Agreement designated an independent accountant, as opposed to a lawyer, the decision maker is but one contributing factor to the Court's ruling.

[95] Merger Agr. § 2.12(b).

[96] Merger Agr. § 6.17(h).

Accountant procedure under Section 6.17(g), however, does not arise until *after* closing.[97] Reading Section 6.17(e)'s litigation bar to refer all disputes under Section 6.17 to the Settlement Accountant, therefore, renders Trimaran's rights under Section 6.17(h) unenforceable. Accordingly, Ray Beyond's interpretation must be rejected.

Like the provisions in *Chicago Bridge*, *Penton*, and *AQSR*, the Merger Agreement's expert-not-arbitrator language evidences the parties' intent to narrow the Settlement Accountant's authority to disputes related to its technical expertise. Read in light of the expert-not-arbitrator provision, "the matter" of the "appropriate distribution of the CPS Escrow Amount" referenced in Section 6.17(g) must be limited to discrete, non-legal issues within the scope of an independent accounting firm's authority.[98]

The parties' dispute is not within the scope of the Settlement Accountant's narrow authority. The crux of the parties' current dispute is whether the Extension

---

[97] *Id.* § 6.17(g) ("In the event that the CPS Escrow Amount is not fully distributed prior to July 1, 2018 . . . the matter shall be referred to the Settlement Accountant"). The July 1, 2018 date is after the April 30, 2018 closing date contemplated in Section 2.1.

[98] Even if, as Ray Beyond argues, Section 6.17(e)'s litigation bar requires that all "matters *that are the subject of Section 6.17*" must be resolved by the Settlement Accountant, Merger Agr. § 6.17(e) (emphasis added), the question of what constitutes a New CPS Contract is not within the scope of the Settlement Accountant's authority. This is so because the definition of New CPS Contract is "*the subject of*" the definitions of *Section 1.1*, not *Section 6.17*, and thus not subject to the litigation bar as interpreted by Ray Beyond.

qualifies as a New CPS Contract. Resolving this question does not fall to an independent accountant's expertise, but rather, requires a legal conclusion concerning whether the Extension meets the definition of New CPS Contract as set forth in Section 1.1 of the Merger Agreement.

For all of these reasons, Ray Beyond's motion for judgment on the pleadings on its claim for specific performance is denied.[99]

## B.    Trimaran's Counterclaims against Ray Beyond

Ray Beyond's sole argument for dismissal of Trimaran's four counterclaims is to repeat its argument for specific performance. "Because the parties agree[d] that the Settlement Accountant – not this Court – has exclusive jurisdiction to determine the CPS Escrow Account dispute," according to Ray Beyond, Trimaran's claims for declaratory relief, breach of the Merger Agreement, breach of the implied covenant of good faith and fair dealing, and unjust enrichment must also be dismissed.[100] Because Ray Beyond offers no arguments in support of dismissal other than the ones

---

[99] Trimaran's Counterclaim I seeks a declaration that the Extension qualifies as a New CPS Contract. Trimaran Compl. ¶¶ 36-38. Trimaran did not seek affirmative relief on this claim, and counsel for Trimaran stated at oral argument that resolution of Counterclaim I might require discovery. Nov. 29, 2018 Oral Arg. Tr. at 23:15-24:11. It seems, however, that Ray Beyond will have a difficult time prevailing on this issue, because Section 1.1's definition of the term "Contract," which is subsumed by the definition of "New CPS Contract," expressly includes "extensions." *See* Merger Agr. § 1.1.

[100] Pl.'s Op. Br. at 19.

already rejected, Ray Beyond's motion for judgment on the pleadings as to Trimaran's counterclaims is denied.

### C. Tortious Interference

Count V of Trimaran's Third Party Complaint seeks judgment against Ray Beyond's affiliate Halifax for tortious interference with contract.[101]

"Under Delaware law, the elements of a claim for tortious interference with a contract are: '(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury.'"[102]

Further, a contracting party's parent affiliate may be held liable for tortiously interfering with the contract in limited circumstances only.[103] Affiliate liability is narrowly construed because "courts have recognized the common economic interests between [parents and subsidiaries] and have afforded them great latitude

---

[101] Trimaran Compl. ¶¶ 58-62.

[102] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (italics original) (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)); *see also WaveDivision Hldgs., LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).

[103] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014) ("Delaware's respect for corporate separateness also means that Delaware maintains a role for tortious interference with contract even in the parent-subsidiary context.").

for discussion and joint decision making."[104]   Accordingly, where a complaint alleges tortious interference by a corporate parent,

> a court applying Delaware law analyzes the [question of justification] in a manner that takes into account the dynamics of the parent-subsidiary relationship, including the parent's significant economic interest in its subsidiary, the parent's interest in consulting with its subsidiary about the subsidiary's profit-making opportunities, and the legitimate use of subsidiaries for cabining risk.[105]

"[T]here can be no non-contractual liability of the affiliated corporation . . . unless the plaintiff pleads and proves that the affiliate sought not to achieve permissible financial goals but sought maliciously or in bad faith to injure plaintiff."[106]

Trimaran's Complaint includes sparse allegations specific to Halifax.   It alleges conclusorily that Ray Beyond took certain actions "under the direction of Halifax"[107] and that, with Ray Beyond, Halifax "unilaterally executed an instruction

---

[104] *Shearin v. E.F. Hutton Gp., Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994); *see also James Cable, LLC v. Millenium Digital Media Sys., L.L.C.*, 2009 WL 1638634, at *4 (Del. Ch. June 11, 2009) ("Delaware law . . . shields companies affiliated through common ownership from tortious interference with contract claims when the companies act in furtherance of their shared legitimate business interests.").

[105] *NAMA Hldgs.*, 2014 WL 6436647, at *28.

[106] *Id.*; *see also Bhole*, 67 A.3d at 453 (alterations omitted) (quoting *Shearin*, 652 A.2d at 591) (The complainant "must show that the corporate defendant 'was not pursuing in good faith the legitimate profit seeking activities of its affiliated enterprise' that was a party to the contract.").

[107] Trimaran Compl. ¶ 7 ("[R]ather than complying with the Merger Agreement, Ray Beyond, acting under the direction of Halifax, refused to execute the joint instruction and release the CPS Escrow Amount . . . .").

releasing the CPS Escrow Amount to Halifax . . . ."[108] Finally, Trimaran argues that "[t]here was no legal justification for Halifax's actions of wrongfully denying Trimaran the CPS Escrow Amount plus Trimaran's portion of any interest accrued to Trimaran,"[109] but fails to allege anywhere that it was Halifax that denied Trimaran the CPS Escrow Amount.

Trimaran's allegations specific to Halifax are insufficient to support an inference that Halifax interfered with the contract between Ray Beyond and Trimaran. Even less does the Third Party Complaint allege facts that could lead to the conclusion that Halifax did so maliciously or in bad faith, as is required to support a claim for tortious interference against an affiliate.

Halifax's motion for judgment on the pleadings is therefore granted.

## III.  CONCLUSION

For the reasons explained above, Ray Beyond's motion for judgment on its claim for specific performance and on Trimaran's four counterclaims is DENIED. Halifax's motion for judgment on the pleadings against Trimaran's third-party complaint for tortious interference is GRANTED. The stay granted in the November 29, 2018 bench ruling and the December 18, 2018 Implementing Order is LIFTED.

**IT IS SO ORDERED.**

---

[108] *Id.* ¶ 60.

[109] *Id.* ¶ 61.